The ELTON ORCHARDS, INC.,
Plaintiff-Appellee,

v.

Peter J. BRENNAN, Secretary of Labor, United States Department of Labor, et al., Defendants-Appellants.

No. 74–1315.

United States Court of Appeals,
First Circuit.

Dec. 19, 1974.

Carl W. Gerig, Jr., Counsel for Manpower Litigation, U. S. Dept. of Labor, and John Edward Harris, Atty., Dept. of Justice, Washington, D. C., with whom John L. Murphy, Chief, Government Regulations Section, Crim. Div., and George W. Masterton, Atty., Dept. of Justice, were on brief, for appellants.

Edward F. Smith, Andre J. Barbeau, and Joseph Stewart, Concord, N. H., on brief for Benjamin C. Adams, Commissioner, Dept. of Employment Security, State of New Hampshire, appellant.

Shane Devine, Manchester, N. H., with whom Devine, Millimet, Stahl & Branch, Manchester, N. H., was on brief, for appellee.

Katherine S. Gruenheck, Washington, D. C., on brief for Migrant Legal Action Program, Inc., Amicus Curiae.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

This is an appeal by the Secretary of Labor and two other allied federal defendants from a preliminary injunction entered by the District Court for New Hampshire ordering them to make available to appellee a number of foreign apple pickers. At issue is the interstate clearance system for recruitment of agricultural workers (ICS) established by 20 C.F.R. §§ 602.2 and 602.9, under authority of the Wagner-Peyser Act, 29 U.S.C. § 49 et seq. The ICS is one element of a complex statutory structure designed to facilitate the employment of domestic workers for seasonal agricultural labor, and to permit the use of foreign nationals temporarily admitted to the United States to work for a specific employer if domestic workers are unavailable. The events leading to this appeal cannot be understood without prior explanation of the statutes and regulations involved.

The Wagner-Peyser Act authorizes the establishment of a federal employment service, and the designation of state employment services to function in conjunction with the federal service and to receive federal funding. The responsibilities of the federal service are lodged with Manpower Administration in the Department of Labor. The designated state agencies in New Hampshire and Louisiana, which figure in the events described below, are their respective Departments of Employment Security. Regulations promulgated pursuant to the Wagner-Peyser Act provide first for state agency placement of local workers with local agricultural employers. 20 C.F.R. § 602.8. If local workers are not available, the ICS may be used to recruit, through other state agencies, workers available in other states. 20 C.F.R. §§ 602.2 and 602.9. Workers recruited through the state agencies are protected by a series of regulations prescribing minimum working and living conditions. 20 C.F.R. §§ 602.9–602.11, 620.1–620.17.

The Immigration and Nationality Act, 8 U.S.C. § 1101 et seq., permits the admission of aliens to serve as temporary agricultural laborers if domestic workers are unavailable. The Act defines as a "nonimmigrant" an alien who ". . . is coming temporarily to the United States to perform temporary services or labor, if unemployed persons capable of performing such service or labor cannot be found in this country . . . ." 8 U.S.C. § 1101(a)(15)(H)(ii). Nonimmigrants thus defined may be admitted upon a determination by the Attorney General after "consultation with appropriate agencies of the Government" that the pertinent requirements are satisfied. 8 U.S.C. § 1184(c). This determination is in fact delegated to the Immigration and Naturalization Service (INS). INS regulations require that an employer's petition for the admission of nonimmigrant aliens to perform temporary service be accompanied by ". . . a certification from the Secretary of Labor . . . stating that qualified persons in the United States are not available and that the employment of the beneficiary will not adversely affect the wages and working conditions of workers in the United States similarly employed, or a notice that such certification cannot be made . . . ." 8 C.F.R. § 214.-2(h)(3). If the Secretary of Labor states that the certification cannot be made ". . . the petitioner shall be permitted to present [to INS] countervailing evidence that qualified persons in the United States are not available and that the employment policies of the Department of Labor have been observed." Id.

The Labor Department regulations empower the Regional Manpower Administrator to issue the certification required by the immigration regulations if the employer has first filed an offer of employment with the state employment office; and if the Regional Administrator finds that United States workers would not be adversely affected by the admission of alien workers, and that ". . . reasonable efforts have been and will continue to be made by the [state] Employment Service and the employers to obtain domestic workers . . . to perform the work for which the services of temporary foreign workers are requested, and for which domestic work-

ers are not available." 20 C.F.R. § 602.-10(d)(2). Use of the interstate clearance system may be required by the Regional Administrator as a part of the employer's "reasonable efforts" to obtain domestic workers. 20 C.F.R. § 602.10(d)(2).

Appellee has traditionally used, and prefers to use, crews of apple pickers from the British West Indies. In past years appellee, along with other New England apple growers, has submitted to the state employment service clearance orders requesting apple pickers, and, after hiring the few workers locally available, has obtained the requisite certification for the admission of alien workers. On June 10, 1974, appellee submitted to the New Hampshire Department of Employment Security (NHDES) a clearance order requesting 50 workers. The NHDES forwarded appellee's clearance order along with those of other New Hampshire growers to the Regional Manpower Administration with a request for the certification of 404 foreign workers, local workers being unavailable. On July 2, the Regional Manpower Administration notified all six New England state employment services that they should increase their efforts to recruit local workers, and that they were to utilize the ICS, extending the clearance or-ders to Puerto Rico, Ohio, Texas, and Louisiana.[1]

On August 8, appellee was advised by the NHDES that its order would be filled by workers recruited from various parts of Louisiana who had no apple picking experience. In the ensuing five weeks appellee, through an assortment of representatives in New Hampshire and New York, changed its mind half a dozen times with respect to whether it would hire the Louisiana workers.[2] Appellee's order and that of one small orchard were the only orders filled by interstate recruitment through the ICS. Late in August, and early in September, the Department of Labor certified the need for aliens to work in the other New Hampshire orchards.[3] On September 12, appellee filed its complaint in district court, alleging that the certification of foreign workers to other orchards coupled with the refusal to certify them to appellee was arbitrary, capricious, invidiously discriminatory, and a deprivation of property without due process.

The district court held a hearing on September 13, received memoranda from the parties on September 16, and the following day entered an order requiring appellants to make available to appellee "its fair proportion of the foreign pick-

1. The president of the New England Apple Council protested to the Department of Labor that previous extensions of clearance orders outside of the New England states had yielded "disastrous" results for the growers. At oral argument the government indicated that the extension of the ICS outside of New England was, at least partially, a response to the decision of the District Court for the District of Columbia in NAACP, Western Region v. Brennan, 360 F.Supp. 1006 (D.D.C.1973), ordering the implementation of a variety of policies to protect domestic migrant farm laborers.

2. We briefly recount these events as they are described in appellants' brief. August 8—an Elton representative from New Hampshire would go to Louisiana to screen the workers. August 22—representative would not go to Louisiana. August 23—Elton representative called Regional Manpower Administration to protest requirement that Louisiana workers be hired, but, after explanation of certification process, agreed to hire them. September 4—

Elton wrote letter refusing to hire Louisiana workers. September 9 (approximately)—representative of Elton's parent corporation, Norinsberg, advised Labor Department official in Washington that Elton would hire workers. September 10—Norinsberg representative told Labor Department official that apples were dropping to the ground, and Elton could not wait for Louisiana workers. September 11—Elton foreman told Labor Department that apples would not be ready for picking until September 15. Norinsberg representative said that Louisiana workers would not be hired—to avoid subjecting them to a long bus ride. This sequence of changes of position followed immediately by this lawsuit accounts for the Labor Department's failure to supply appellee with written notice of the reasons for the refusal to certify.

3. Allocation of alien workers was made to other orchards on a "fair share" basis. Appellee received no allocation because the Louisiana Department of Employment Security had indicated that it would provide an adequate number of domestic workers to fill appellee's clearance order.

ers".[4] Appellants, rather than attempt to take foreign workers from other orchards, certified 34 additional foreign workers for appellee.

■ Appellants first suggest that the district court lacked jurisdiction, and that appellee failed to exhaust the administrative remedies available to it. We find neither argument persuasive. While we agree with appellants that the district court's reliance on 28 U.S.C. § 1346 was mistaken, Richardson v. Morris, 409 U.S. 464, 465–466, 93 S.Ct. 629, 34 L.Ed.2d 647 (1973), we also agree with appellee's suggestion at oral argument that, as we and a number of circuits have held, jurisdiction may properly be grounded on Section 10 of the Administrative Procedure Act, 5 U.S.C. §§ 701(a), 702, 704 and 706. Bradley v. Weinberger, 483 F.2d 410, 413–414 (1st Cir. 1973); Pickus v. United States Board of Parole, 507 F.2d 1107, n. 4 at 1109 (D.C.Cir. 1974).

■ With respect to exhaustion, appellants suggest that since it is the Attorney General who is empowered to admit aliens as nonimmigrant workers under 8 U.S.C. § 1184(c), appellee should have availed itself of its right to file a petition for the admission of foreign workers, submitting to the Immigration and Naturalization Service its evidence that ". . . qualified persons in the United States are not available and that the employment policies of the Department of Labor have been observed." 8 C.F.R. § 214.2(h)(3). Certainly appellee might have pursued such a course, but its failure to do so does not preclude judicial review. The exhaustion doctrine functions to prevent the disruption of administrative processes by withholding judicial review until the agency has developed the relevant facts, applied its expertise and exercised the discretion entrusted to it by law. McKart v. United States, 395 U.S. 185, 193–194, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969); Parisi v. Davidson, 405 U.S. 34, 37, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972).[5]

> "Closely related to the above reasons is a notion peculiar to administrative law. The administrative agency is created as a separate entity and invested with certain powers and duties. The courts ordinarily should not interfere with an agency until it has completed its action, or else has clearly exceeded its jurisdiction. As Professor Jaffe puts it, '[t]he exhaustion doctrine is, therefore, an expression of executive and administrative autonomy.'" 395 U.S. at 194, 89 S.Ct. at 1663, citing, L. Jaffe, Judicial Control of Administrative Action, at 425 (1965).

■ Here the Labor Department's disposition of appellee's clearance order was

---

4. Appellants argue that the district court acted in such haste as to constitute a denial of due process. They point out that the district court granted them neither an opportunity to put on witnesses, nor a requested one day extension of time in which to prepare the memorandum, affidavits and exhibits which they submitted to the court. We find the district court's actions difficult to justify. The harvest was imminent, but the loss of a day or two to permit the government to present its case could hardly be viewed as unwarranted. In light of the fact that appellants did manage, after working over the week-end, to submit a twenty page memorandum, two substantial affidavits, and several documentary exhibits, we are not inclined to dispose of the case on the basis of the district court's precipitate treatment of appellants.

5. The government relies on two cases as authority for the proposition that appellee failed to exhaust appropriate administrative remedies: Cobb v. Murrell, 386 F.2d 947 (5th Cir. 1967) and Braude v. Wirtz, 350 F.2d 702 (9th Cir. 1965). We read neither case to involve the doctrine of exhaustion. We note also that the Fifth Circuit substantially limited Cobb in Reddy, Inc. v. United States Department of Labor, 492 F.2d 538 (5th Cir. 1974).

Moreover, there is no indication that judicial review at this juncture is premature. Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); see also Raper v. Lucey, 488 F.2d 748 n. 3 at 751 (1st Cir. 1973).

final, the application of policies and regulations within the Department's purview was complete. Now to review the Department's action neither infringes upon "executive autonomy", nor fractures the integrity of the statutory scheme under which the Department functions.

■ Another consideration subsumed under the concept of exhaustion is whether further resort to administrative remedies might have resolved the dispute at the administrative level, obviating the need to expend judicial resources. McKart v. United States, *supra*, at 195, 89 S.Ct. 1657. It is conceivable that had appellee petitioned the INS for the admission of alien workers, and had it submitted evidence supporting its petition the INS would have permitted the importation of the workers. But we regard such an outcome as too speculative to warrant the imposition of a requirement that a petition be processed before the INS prior to judicial review of the Secretary of Labor's refusal to certify an employer's request for alien workers.

". . . [T]here are cases where the customary rationales for the exhaustion of administrative remedies doctrine—avoidance of unnecessary judicial intervention and the need for full, unhampered exercise of agency expertise on a well developed factual record of its own making, *see e. g.* McKart v. United States, 395 U.S. 185, 193–195, [89 S.Ct. 1657, 23 L.Ed.2d 194] (1969)— do not apply and the doctrine's application thus becomes pointless. In some cases the doctrine is no more than 'an exercise in futility,' . . ." American Federation of Government

Employees v. Acree, 155 U.S.App.D.C. 20, 475 F.2d 1289, 1292 (1973).

■ Although the submission of a petition might not be futile, we think the INS would be understandably reluctant to disregard Labor Department findings within the latter department's field of expertise. Further, the pace of events from the blossoming of the trees in the spring when the growers can begin to estimate the size of their crops and the concomitant need for workers, to the beginning of the harvest is relentless and rapid. The interposition of an additional exhaustion requirement would all but assure that judicial review would come too late to aid a litigant who had been treated unfairly.[6]

We thus reach the substantive merits of this appeal. The district court premised its order on a finding that application of the pertinent regulations had resulted in accidental and unconscious, but nevertheless unconstitutional discrimination against appellee. The Department of Labor's refusal to certify appellee's clearance order for the admission of alien workers was a consequence of the selection of that order for recruitment by the Louisiana Department of Employment Security. Such differential treatment neither implicates a fundamental right, nor creates a suspect classification. Our inquiry need go only far enough to determine that there existed a rational basis for appellants' actions. Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

■■ Appellee complains that the allocation to it of the Louisiana workers

---

**6.** Witness this case. Even though treated with expedition by both the district court and this court, the opinion in this appeal arrives long after the last pippin has been left wizzened on the limb by the harsh November frosts. Although our decision comes too late to have any effect on the admission of aliens to pick this year's apple crop we do not view

the case as moot. Next summer the New Hampshire orchards will in all probability again seek the admission of alien workers, and the district court's opinion in this case, if allowed to stand, would have a substantial impact on the Department of Labor's treatment of those requests.

and of no aliens, while other orchards were granted permission to import aliens and were not required to accept domestic workers from distant states, was arbitrary and capricious. In essence appellee challenges the working of the ICS which circulates discrete offers of employment (clearance orders) from individual employers, allowing state employment services to select one or more for recruitment, as Louisiana selected appellee's order. It may be that a system which apportioned domestic workers among the various employers submitting clearance orders would afford greater fairness to the employers, but as long as there is a rational basis for the operation of the system in its present form, inequitable or wasteful results argue for pragmatic reforms rather than adjudications of unconstitutionality. We can conceive of rational bases for the separate treatment of the clearance orders of individual employers. It may be simpler for the Department of Labor and the state employment services to handle separate orders, and more efficient to arrange for the transportation of a group of workers to a particular orchard on a particular date. Further, the present manner of operating the ICS may be the most consistent with the desire to protect domestic workers, which underlies all of the statutory provisions here at issue. Gomez v. Florida State Employment Service, 417 F.2d 569 (5th Cir. 1969); NAACP, Western Region v. Brennan, *supra*; Digilab v. Secretary of Labor, 495 F.2d 323 (1st Cir. 1974). It is idle to assert at this time in our history that because it results in unequal benefits to different persons, a federal statute which is rationally based is unconstitutional. United States v. Carolene Prod-

ucts Co., 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938); Secretary of Agriculture v. Central Roig Refining Co., 338 U.S. 604, 70 S.Ct. 403, 94 L.Ed. 381 (1949).

 In its memorandum submitted to the district court and on appeal appellee also argues that the Department of Labor's refusal to certify was inconsistent with the Wagner-Peyser Act Regulations and the relevant provisions of the Immigration and Nationality Act, basing its argument on a series of cases holding improper the Secretary of Labor's refusal to certify petitions for the admission of skilled workers. *See, e. g.,* Digilab v. Secretary of Labor, *supra*; Ratnayake v. Mack, 499 F.2d 1207 (8th Cir. 1974); Reddy, Inc. v. United States Department of Labor, 492 F.2d 538 (5th Cir. 1974); Secretary of Labor v. Farino, 490 F.2d 885 (7th Cir. 1973). Each of these cases involved an application for a single immigrant visa for a skilled worker under 8 U.S.C. § 1153(a)(6), the reviewing courts finding that the Secretary of Labor had not adequately demonstrated the availability of qualified domestic workers. Appellee asserts an analogous failure here. The Louisiana workers, states appellee, since they were inexperienced, were unqualified.[7] We find the analogy inapposite. In the cases involving § 1153(a)(6) the Secretary of Labor, in rejecting an employer's request for certification with regard to an individual highly skilled worker, has relied on statistical data as to the availability of domestic workers with what the Secretary deemed to be similar skills. Here the Interstate Clearance System produced actual workers prepared to perform the tasks required by appellee.[8] The Labor

---

**7.** Even if we accepted the analogy appellee seeks to draw, we find the argument unpersuasive since the only relevant job specifications listed on appellee's clearance order were ability to climb 15 to 20 foot ladders, good health, "good judgment in determining the right color of the apples ready to be picked", and a 9 hour working day. Experience was not listed as a requirement. Moreover, apple picking is described as unskilled labor in the

Dictionary of Occupational Titles published by the Department of Labor. Finally, appellee admits that many of its workers in the past years, both foreign and domestic, have been inexperienced.

**8.** The analogy would be stronger had appellee, as it originally said it would, sent a representative to Louisiana to screen the proffered workers, and had he then found some or all

Department Regulations provide specific procedures, including use of the ICS to determine whether a clearance order should be certified for the use of alien workers. The use of such procedures is not inconsistent with the statutory framework erected by the immigration statutes for the admission of temporary laborers as nonimmigrants. Because of the unskilled nature of the work, the number of aliens for whom admission is annually sought, and the brief duration of the aliens' presence in the United States the certification process is necessarily less discerning than that applied to petitions on behalf of skilled workers for immigrant visas, but that distinction simply reflects the statutory pattern; it does not depart from it. We recognize that appellee's business depends on the proper harvesting of its crop during the brief span of weeks when the apples are ready, and that there may be good reason for appellee's wish to be able to rely on the experienced crews of British West Indians who have performed well in the past, but here that preference collides with the mandate of a Congressional policy. To recognize a legal right to use alien workers upon a showing of business justification would be to negate the policy which permeates the immigration statutes, that domestic workers rather than aliens be employed wherever possible.

We therefore reverse the judgment of the district court. While we have not addressed the propriety of the court's ruling that plaintiff faced the prospect of irreparable harm, we are convinced that, at least on the basis of such evidence as was presented at the abbreviated hearing, plaintiff did not demonstrate a sufficient likelihood that it would ultimately prevail on the merits.

Reversed.

of them unqualified by reason of specific defects in their physical or mental condition. Appellee complains that the dispersion of the workers in various localities in Louisiana made individual screening burdensome. We

find it difficult to credit this complaint when appellee annually makes all the arrangements to bring in a crew from the British West Indies, and this year brought in a crew from Arizona.