VIRGINIA AGRICULTURAL GROWERS ASSOCIATION, INC., Plaintiff,

v.

Raymond DONOVAN, Secretary U.S. Department of Labor, et al., Defendants.

Civ. A. No. 83–0108–D.

United States District Court, W.D. Virginia, Danville Division.

Jan. 27, 1984.

Morris Kletzkin, Albert D. Misler, Washington, D.C., W. Carrington, Thompson, Clement & Wheatley, Danville, Va., for plaintiff.

Chester A. Hurwitz, U.S. Dept. of Labor, Washington, D.C., Robert J. Barry, Asst. Atty. Gen., Richmond, Va., for VEC.

John P. Alderman, U.S. Atty., Roanoke, Va., for defendants.

Robert N. Moore, Virginia Farm Workers Legal Assistance Project, Belle Haven, Va., Robert Willis, North Carolina Farm Worker Legal Services, Newton Grove, N.C., Dale M. Wiley, Virginia Legal Aid Society, Danville, Va., for intervenors.

## MEMORANDUM OPINION

KISER, District Judge.

This action was instituted by Plaintiff, Virginia Agricultural Growers Association, Inc. (VAGA) on July 20, 1983, against Raymond S. Donovan, Secretary of Labor (DOL) and Ralph C. Cantrell, Commissioner of the Virginia Employment Commission (VEC). Pursuant to this Court's Order of October 5, 1983, permission was granted for the intervention of seven United States migrant farmworkers in this case. VAGA is an association of approximately 216 agricultural producers in southside Virginia, primarily engaged in the production of tobacco. The association was formed in 1979.

Plaintiff seeks declaratory and injunctive relief against the governmental Defendants. This action involves what has been referred to as the H-2 labor program and, specifically, § 214 of the Immigration and Nationality Act, 8 U.S.C. § 1184, and § 101(a)(15)(H)(ii), 8 U.S.C. § 1101, *et seq.* of that Act (INA). The Plaintiff alleges that the United States Department of Labor regulation appearing at 20 C.F.R. § 655.203(e) (the 50% rule) was promulgated by DOL without appropriate statutory or regulatory authority. Plaintiff further contends that the 50% rule is an unreasonable regulation, is arbitrary, and capricious and that its enforcement will defeat, and runs contrary to the purposes of Section 214 of the INA.[1] The 50% rule is part of a

---

1. Plaintiff has also asserted that DOL has changed its policy as to enforcement of the 50% rule. The Plaintiff's evidence tended to show that at one time it was DOL's opinion that enforcement of the rule would require an employer to terminate H-2 workers, but that DOL has now changed its position—i.e., enforcement of the rule does *not* require the employer to terminate H-2 workers. Regardless of DOL's enforcement policy and its opinion as to the effect of enforcing the 50% rule, I find as a practical matter the enforcement of the Rule would require the employer to terminate H-2 workers in a number equal to the domestic workers he is required to hire. But, as appears later in the opinion, I do not feel that this has any substantial bearing on either the authority of the DOL

regulatory scheme set in place by the INA which establishes regulations to be followed by employers who seek to use temporary or seasonal foreign workers.

Defendant Donovan's Motion for Summary Judgment in this action was denied on November 1, 1983. The case was tried without a jury on November 21–22, 1983, in Danville, Virginia.

The issues thus before this Court are: (1) does the DOL have the legal authority to promulgate the 50% rule; and (2) is the regulation arbitrary, capricious or an abuse of discretion?

## I. *The Statutory and Regulatory Framework*

The admission of foreign workers into the United States to perform temporary labor is accomplished through a multi-tiered administrative process established by the INA, 8 U.S.C. § 1101, *et seq.* The INA defines as non-immigrant as a person: "... having a residence in a foreign country which he has no intention of abandoning ... who is coming temporarily to the United States to perform temporary services or labor, if unemployed persons capable of performing such service or labor cannot be found in this country." 8 U.S.C. § 1101(a)(15)(H)(ii).

The conditions for admission to the United States under § 1101(a)(15)(H)(ii) (the H–2 program) are established by the Attorney General, pursuant to 8 U.S.C. § 1184(a) which provides, in pertinent part, that: "The admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General may by regulations prescribe...."

The INA further requires the Attorney General to consult with the appropriate agencies of the Government prior to a determination on an employer's petition for the importation of temporary nonimmigrant alien workers:

(c) The question of importing any alien as a nonimmigrant under section 1101(a)(15)(H) or (L) in any specific case or specific cases shall be determined by the Attorney General, after consultation with appropriate agencies of the Government, upon petition of the importing employer. Such petition shall be made and approved before the visa is granted. The petition shall be in such form and contain such information as the Attorney General shall prescribe. The approval of such a petition shall not, of itself, be construed as establishing that the alien is a nonimmigrant. 8 U.S.C. § 1184(c).

As a second step in this process, the Immigration and Naturalization Service (INS), as the Attorney General's delegated agent in this program, has promulgated regulations for the admission of temporary workers under the H–2 program. These regulations promulgated by the INS incorporate DOL into this administrative scheme by requiring applications by employers who wish to utilize aliens under the H–2 program to be accompanied by:

[e]ither a certification from the Secretary of Labor or his designated representative stating that qualified persons in the United States are not available and that the employment of the beneficiary will not adversely affect the wages and working conditions of workers in the United States similarly employed, or a notice that such certification cannot be made.... If there is attached to the petition a notice from the Secretary of Labor or his designated representative that certification cannot be made, the petitioner shall be permitted to present countervailing evidence that qualified persons in the United States are not available and that the employment policies of the Department of Labor have been observed. All such evidence submitted will be considered in the adjudication of the petition. 8 C.F.R. § 214.-2(h)(3).

In response to this delegated authority, the DOL has in turn promulgated regulations relating to its role in the H–2 program, including the challenged regulation

---

to promulgate the Rule or upon the arbitrariness or capriciousness of the Rule.

in this case, 20 C.F.R. § 655.203(e) which provides in pertinent part, that:

> From the time the foreign workers depart for the employer's place of employment, the employer will provide employment to any qualified United States worker who applies to the employer until fifty percent of the period of the work contract, under which the foreign worker who is in the job was hired, has elapsed. In addition, the employer will offer to provide housing, and the other benefits, wages, and working conditions required by § 655.202, to any such United States worker.

The DOL regulation is part of the temporary labor certification application which includes certain assurances made by the employer at the time of certification that qualified persons in the United States are not available. One of these assurances is that the employer will provide employment to any qualified United States worker who applies to that employer until fifty percent of the contract period under which the foreign worker was hired, has elapsed—hence, the 50% rule.

In addition, in order to enforce compliance with the assurances made by an employer wishing to participate in the H–2 program, the DOL has promulgated a regulation at 20 C.F.R. § 655.210(a) which provides, in pertinent part, that:

> (a) If, after the granting of a temporary labor certification, the RA [Regional Administrator] has probable cause to believe that an employer has not lived up to the terms of the temporary labor certification, the RA shall investigate the matter. If the RA concludes that the employer has not complied with the terms of the labor certification, the RA may notify the employer that it will not be eligible to apply for a temporary labor certification in the coming year.

Thus, this three-tiered regulatory scheme establishes a program by which United States agricultural producers can supplement their domestic labor force with nonimmigrant alien workers when it has been determined, in accordance with these regulations and procedures, that qualified United States workers are not available and the importation of such workers will not adversely affect those United States workers similarly employed.

## II. *Facts In This Case*

Before turning to the facts which are the basis of this lawsuit, I believe it is necessary to establish why VAGA needs to utilize the H–2 program. Therefore, it is necessary to review generally the operations of the tobacco farmer. According to testimony at trial, the tobacco-growing season is as follows: in January, February, and March, the farmer is in the planning stage, with seeding of tobacco beds occurring in February; in April the farmer prepares to start planting and the actual transplanting from the beds takes place which requires additional labor (such as H–2 workers); in May and June additional labor is also needed as cultivating of the crop occurs; finally, in July the farmer harvests the crop which must be done as the leaves mature or the crop is lost. Thus, July is also a critical period when additional labor is required.

In response to this need for additional labor, VAGA undertakes recruitment in early January for farm workers whose employment would commence in late April. The recruitment program is initiated both independently and through the Virginia State Employment Service facilities, acting as agents for the DOL. Despite these recruitment efforts, sufficient numbers of workers residing in the southside Virginia area and those workers available through the Interstate Clearance System have not been able to meet VAGA's seasonal labor requirements. Accordingly, VAGA has turned to the H–2 program to supplement its seasonal labor requirements and has imported Mexican workers to satisfy their labor shortage.

On January 31, 1983, Plaintiff VAGA filed a job order with the Defendant VEC for an April 25, 1983, date of need (planting). The Plaintiff filed a second job order with the VEC on April 15, 1983. These job

orders are the essential first step to obtaining authorization from the Attorney General to import temporary alien labor pursuant to the H–2 program. During this period and continuing through April 25, 1983, VAGA continued to interview and offer employment to qualified United States workers. On or about April 11, 1983, DOL approved a labor certification for 287 workers. With this petition approved, the then currently available jobs for the planting of the tobacco and cabbage crop had been filled.

On May 16, 1983, VAGA filed a new job order for 599 temporary workers for its July 5, 1983, date of need (harvest). On June 15, 1983, the DOL notified the Plaintiff that there were not enough available United States workers to fill these job opportunities and issued a labor certification for 506 workers. On June 24, 1983, DOL issued a labor certification for the admission of an additional 66 workers. On July 1, 1983, the INS approved VAGA's petition to recruit 599 Mexican nationals to supplement its agricultural workforce.

On July 15, 1983, the Defendant VEC demanded that VAGA interview and hire approximately 55 domestic workers. This demand was, of course, made after VAGA had contracted for H–2 labor and according to testimony on behalf of VAGA, there were no slots available for these workers with VAGA's farmers.

Testimony by members of VAGA revealed that if they had to hire these domestic workers, then the reality of the situation would be that 55 Mexican laborers would have had to be terminated. In addition, the farmers would have had to pay these alien laborers for three-quarters of the contract period computed on the basis of an eight-hour day based on other regulations pursuant to this process. 20 C.F.R. § 655.203(i) and 20 C.F.R. § 655.202(b)(6)(1). A serious problem which is faced by these farmers is that the domestic workers hired have not stayed on the job and thus, according to testimony, are an unreliable source of labor. As previously noted, the timing of the planting and harvesting of the tobacco crop is critical. Thus, if the VAGA members were forced to terminate Mexican labor and hire the domestic workers and these domestic workers subsequently quit, the farmer is faced with possible ruination of his crop. Thus, the application of the 50% rule could very well impose a hardship on the farmer.

Realizing the potential problem that the demands made by the VEC posed in maintaining a stable labor force, VAGA refused to comply and on July 20, 1983, filed this action. By letter dated July 25, 1983, VAGA notified the DOL Regional Administrator that it had filed suit for declaratory judgment to have this Court determine whether the DOL was empowered to promulgate and enforce the 50% rule. By letter dated July 29, 1983, VAGA was notified by DOL that it would be ineligible to apply for a labor certification in 1984.

III. *Questions Before This Court*

A. *Does the DOL Have the Authority to Promulgate the 50% Rule?*

1. Judicial Review.

■ Judicial review of an agency regulation is to determine (1) the authority of the agency, (2) compliance by the agency with procedural requirements, and (3) any claim that the agency action is arbitrary or capricious. 5 U.S.C. 706(2)(A) and (C); *E.I. duPont de Nemours & Co. v. Train*, 541 F.2d 1018, 1026 (4th Cir.1976), *aff'd in relevant part*, 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977). As conceded by the parties, the only questions before this Court are whether DOL exceeded its authority to promulgate the 50% rule and whether the rule is arbitrary and capricious.

■ Regulations must be consistent with the statutory authority which alone gives them validity; they may lack rhyme and may sometimes be turgid, but they must be based on some kind of reason. *Day v. United States*, 611 F.2d 1122, 1124 (5th Cir.1980), *cert. denied*, 449 U.S. 919, 101 S.Ct. 316, 66 L.Ed.2d 146 (1980). The agency in its rulemaking is to be allowed reasonable discretion with regard to the

scope of authority and its regulation must be upheld if it is a legitimate, reasonable, and direct adjunct to the express statutory authority. *United States v. Chesapeake and Ohio Railroad Co.*, 426 U.S. 500, 514, 96 S.Ct. 2318, 2325, 49 L.Ed.2d 14 (1976); *Humana of Virginia, Inc. v. Blue Cross of Virginia*, 622 F.2d 76, 78 (4th Cir.1980). In addition, the interpretation of a statute by the agency charged with enforcement or administration is entitled to great deference provided it is consistent with Congressional purpose. This deference is especially appropriate where the rule was adopted only after all interest persons were given notice and opportunity to comment pursuant to the Administrative Procedure Act. *Production Tool Corp. v. Employment and Training Admin.*, 688 F.2d 1161, 1167 (7th Cir.1982).

## 2. The 50% Rule

As to the specific issue regarding the promulgation of the 50% rule, a brief summary of the parties respective positions is appropriate.[2] The Plaintiff submits that the DOL exceeded its statutory function and, therefore, its legal authority in promulgating the 50% rule. The authority for the regulation is derived from the INS regulation at 8 C.F.R. § 214.2(h)(3)(i). *See* 43 Fed.Reg. 10,306 (1978) [codified at 20 C.F.R. § 655.203(e)]. As noted above, this INS regulation requires petitioning employers to obtain a certification from DOL before INS will approve an employer's petition for importing alien labor. The role of DOL is that of a consulting nature within the contemplation of 8 C.F.R. § 214.-2(h)(3)(i). The purpose of the labor certification is to ascertain that "unemployed persons capable of performing such service or labor cannot be found in this country" before the INS reaches a decision to approve or deny a pending petition.

The essential vice of the Rule, from the Plaintiff's viewpoint, is that the information the INS seeks through the labor certification process is information relative only to the availability of United States workers

at the time the labor certification is required and that to require assurance beyond that period, extending into 50% of the H–2 workers contract period, is beyond the scope of the consultative nature of the DOL's authority. In addition, the requirement contained in 20 C.F.R. § 655.203(e) for employers to give assurance of compliance with the 50% rule as a condition of obtaining a labor certification is, in fact, a condition of participation in the H–2 program which is not required by the INS as contemplated under the INA, but is in fact, usurpation by DOL of authority committed by Congress to the discretion of the INS. The rule also potentially requires displacement of H–2 workers as discussed above. Finally, the 50% rule, according to VAGA, undercuts the underlying purpose of Congress in enacting Section 214 of the INA (i.e. assuring growers an ample supply of foreign labor).

The DOL argues that promulgation of the 50% rule was a lawful exercise of the authority delegated to the Secretary of Labor under the H–2 program. According to DOL, the Secretary's authority to issue regulations in this area in furtherance of its responsibilities under the H–2 program has repeatedly been upheld by federal appellate courts. *Rowland v. Marshall*, 650 F.2d 28 (4th Cir.1981); *Flecha v. Quiros*, 567 F.2d 1154 (1st Cir.1977), *cert. denied*, 436 U.S. 945, 98 S.Ct. 2846, 56 L.Ed.2d 786 (1978); *Rogers v. Larson*, 563 F.2d 617 (3d Cir.1977); *Florida Cane Sugar League, Inc. v. Usery*, 531 F.2d 299 (5th Cir.1976); *Elton Orchards v. Brennan*, 508 F.2d 493 (1st Cir.1974). The DOL's authority is based on its assertion that underlying statutory purpose of the INA under the H–2 program is to protect the domestic workers' right to work. Additionally, the 50% rule does not require that employers of H–2 workers terminate aliens.

The Defendant-Intervenors also point out that a long line of cases, as cited by DOL above, conclude that the underlying purpose of the H–2 program is the protection of employment opportunities of United

---

**2.** Defendant VEC has adopted the briefs of Defendant DOL as its own in this case.

States workers. Further, Defendant-Intervenors' position is that to claim that DOL lacked legal authority to promulgate the 50% rule, which provides for a continued opportunity for employment for United States workers, ignores the legislative history and Congressional intent surrounding the H–2 provision of the INA. Also, as the consulting agency to the Attorney General, DOL must certify both that United States workers are not available and that the employment of foreign workers will not adversely affect the wages and working conditions of United States workers.

### 3. Analysis.

The 50% rule must be upheld if it is a legitimate, reasonable, and direct adjunct to the express statutory authority. This authority is as previously set forth above, Section 214 of the INA and the regulations promulgated thereunder.

Plaintiffs suggest that the case of *Rogers v. Larson*, 563 F.2d 617 (3d Cir.1977) is dispositive of the issue as to the authority of the DOL to promulgate the 50% rule. In that case the questions were whether a Virgin Islands statute which provided for the replacement of alien nonimmigrant workers in the Virgin Islands with United States citizens or permanent resident aliens was (1) preempted under the Supremacy Clause of the United States Constitution, by the INA or (2) violative of the Equal Protection Clause of the Fourteenth Amendment. The court noted that both the INA and the Virgin Islands statutory provisions present a comprehensive scheme for regulating the employment of nonimmigrant alien workers. In the case, the appellant was admitted to the Virgin Islands as an H–2 worker. Prior to his entry, a determination had been made in accordance with applicable INS and DOL regulations that local workers were not available and the required labor certification was issued. Thereafter, in accordance with the requirements of the Virgin Islands statute, the employer, who was notified that a local worker had become available, terminated appellant's employment.

In the court's examination of the two statutory schemes, it was noted that:

> although they share some common purposes, they are in direct conflict in the present case. The common purposes are to assure an adequate labor force on the one hand and to protect the jobs of citizens on the other. Any statutory scheme with these two purposes must inevitably strike a balance between the two goals. 563 F.2d at 626.

The court found that under the Virgin Islands statute "an employer may be ordered to terminate the employment of an alien at any time if the Virgin Islands Commissioner of Labor determines that a qualified resident worker is available or if he determines that such termination is in the public interest." 563 F.2d at 626. The court concluded that one of the considerations behind the federal regulations is continuity of the work force and under the Virgin Islands statute the employer and the alien have no assurance as to the duration of employment. Therefore, the Virgin Islands statute was held invalid under the Supremacy Clause, being in conflict with the INA.

Plaintiff argues that the practical effect of the 50% rule is to require a farmer to terminate an H–2 worker to make room for a domestic worker and that under such circumstances, a farmer can ill afford to hire foreign workers. Thus, Congress' purpose of assuring the farmer an adequate supply of foreign labor is thwarted. Plaintiff concludes that since the regulation conflicts with the statutory purpose of the INA, it must yield as did the Virgin Islands statute in *Rogers*.

In my opinion, *Rogers* cannot be analogized to stand for the proposition that the DOL has no legal authority to promulgate the 50% rule. Although the practical effect of the 50% rule may in fact be that a farmer would have to terminate an H–2 worker to make room for a domestic worker, such argument takes into account only a portion of the statutory scheme of the INA. Another purpose of the INA is to

assure that foreign workers do not adversely affect domestic workers.

■ I believe the 50% rule, as part of this scheme, is an effort to strike a balance between these two goals and well within DOL's statutory authority to promulgate regulations. The role of DOL is to certify that United States workers are not available thus allowing the employer to proceed through the regulatory scheme and contract for alien labor in order to assure an adequate labor force. The goal of protecting the job of citizens is furthered by the 50% rule which insures that those small groups of available domestic employees who might not be known to DOL at the time of the initial certification process are protected. It is virtually impossible to certify that no United States workers are available except as to large contingents of workers at the time the DOL issues its certification. The 50% rule is, in a sense, a safety net to protect the jobs of citizens.

■ Further, it is my opinion that the INA contemplates a preference for United States workers. For example, the Supreme Court in *Alfred L. Snapp & Sons, Inc. v. Puerto Rico*, 458 U.S. 592, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982) in discussing the Wagner-Peyser Act, 29 U.S.C. § 49 *et seq.* [establishes nationwide employment service] and the INA and regulations promulgated thereunder notes that:

> The obvious point of this somewhat complicated statutory and regulatory framework is to provide two assurances to United States workers.... First, these workers are given a preference over foreign workers for jobs that become available within this country. Second, to the extent that foreign workers are brought in, the working conditions of domestic employees are not to be adversely affected, nor are United States workers to be discriminated against in

favor of foreign workers. 458 U.S. at 596, 102 S.Ct. at 3263.[3]

The Court in *Florida Sugar Cane League, Inc. v. Usery*, 531 F.2d 299, 300–01 (5th Cir.1976) (sugar cane growers sought to enjoin the Secretary of Labor's publication of an "adverse effect wage rate" for sugar cane in Florida) also reached this conclusion in regard to the statutory purpose of this regulatory scheme. "Thus, from this multi-tiered scheme of delegated statutory authority, ultimately it is the Secretary of Labor who is responsible for whatever fact finding and evaluation are necessary to effectuate the statutory purpose of protecting domestic workers' right to work."

Similarly, the court in *Elton Orchards v. Brennan*, 508 F.2d 493, 500 (1st Cir.1974) (appeal from preliminary injunction ordering the Secretary of Labor to make available to a New Hampshire apple grower a number of foreign apple pickers after DOL refused to certify appellee's clearance order for the admission of alien workers) in discussing the statutory framework erected by the INA for the admission of temporary laborers as nonimmigrants stated:

> We recognize that appellee's business depends on the proper harvesting of its crop during the brief span of weeks when the apples are ready, and that there may be good reason for appellee's wish to be able to rely on the experience of crews of British West Indians who have performed well in the past, but here that preference collides with the mandate of a Congressional policy. To recognize a legal right to use alien workers upon a showing of business justification would be to negate the policy which permeates the immigration statutes, that *domestic workers rather than aliens be employed whenever possible* (emphasis added). 508 F.2d at 500.

---

**3.** The specific holding in the case was that the Commonwealth of Puerto Rico's complaint which alleged that petitioners discriminated against Puerto Rico in favor of foreign laborers and that Puerto Ricans were denied the benefits

of access to domestic work opportunities that the Wagner-Peyser Act and the INA were designed to secure for United States workers will support a *parens patriae* action.

Therefore, I conclude that DOL had the legal authority to promulgate the 50% rule. The regulation is consistent with the statutory authority and the statutory purpose which is providing a foreign work force while protecting domestic workers' right to work.

### B. *Is the 50% Rule Arbitrary and Capricious?*

1. Judicial Review and Analysis.

 The standard of review used in determining whether an agency regulation is arbitrary and capricious is limited to ascertaining whether the regulation "was based on a consideration of the relevant factors", *Humana of Virginia, Inc. v. Blue Cross of Virginia,* 622 F.2d 76, 79 (4th Cir.1980), and whether there has been a clear error of judgment. In addition, the Court may not substitute its own judgment for that of the agency. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). My determination is to be made on the administrative record and not by *de novo* review. *SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

 The 50% rule was promulgated by the Secretary of Labor on March 10, 1978, as part of the comprehensive H–2 regulations. The regulation was initially proposed in January, 1977. 42 Fed.Reg. 4670–73 (1977). Pursuant to the rulemaking procedures set forth at 5 U.S.C. § 553, interested parties were given an opportunity to testify on the proposed regulations during hearings held in six different locations prior to adoption of the final rules. 43 Fed. Reg. 10,306 (1978). About 170 individuals or organizations testified at the hearings and/or submitted statements for the record.

In the Secretary's Supplementary Information published in regard to the 50% rule when the regulation was promulgated, it was noted that employers urged that their responsibility in regard to recruitment of

United States workers after certification should end at the time of certification. Worker representatives urged that the responsibility should continue until the end of the harvest. 43 Fed.Reg. 10,308 (1978).

The evidence introduced at trial by DOL containing testimony received by DOL during the six public hearings with respect to the proposed H–2 regulations bears this out. Defendants' Trial Exhibit # 3. For example, at the public hearing held in Springfield, Massachusetts, on June 9, 1977, Dr. Church Crawford, a New Hampshire apple grower and H–2 employer, testified about his experience with DOL's regulation which was the predecessor of the 50% rule.[4] In 1976, DOL required that Dr. Crawford hire United States workers from Florida only two weeks prior to the end of his six week harvest season. Defendants' Exhibit # 3, Attachment # 1, pp. 2–163 thru 167. In further testimony, Dr. Crawford's attorney stated that the proposed 50% rule would have resolved many of the problems faced by his client. *Id.* at 2–173 thru 174. The problems Dr. Crawford spoke of are the precise problems VAGA complains of in this lawsuit—having to pay the H–2 workers ¾ of the work contract whether or not they were needed and terminating them because of the need to hire the domestic crew as was discussed above. Thus, this problem was squarely before the Secretary.

I have reviewed all of the testimony in Defense Exhibit # 3 as well as the complete record in this case and conclude that the Secretary did consider the relevant factors in promulgating this regulation. The desire of the employer to maintain an adequate and reasonable labor force was considered as well as the workers' contention that domestic workers rather than aliens be employed whenever possible. Although I agree with the Plaintiffs that the 50% rule might very well cause a hardship to its members, these hardships were considered by the Secretary and the rule does have a reasonable basis. Since I have con-

---

**4.** This regulation provided that certification would be granted only if reasonable efforts to recruit United States workers "will continue to be made". 20 C.F.R. § 610.10(d)(2).

cluded that the INA contemplates a preference for United States workers, I find that it is not arbitrary nor capricious to require employers to offer United States workers employment until 50% of the H–2 contract has expired. Further, from the employer's point of view, the 50% rule as promulgated in 1978 was an improvement over the previous regulation which required that United States workers be offered the opportunity to work until the last day of the contract period. Additionally, active recruitment of United States workers is now only required up until the time foreign workers arrive.

In conclusion, I find that the DOL had the authority to promulgate the 50% rule and the regulation is neither arbitrary nor capricious.

An appropriate Order will issue.