756 F.2d 1025
 81 A.L.R.Fed. 519
 VIRGINIA AGRICULTURAL GROWERS ASSOCIATION, INC., Appellant,
v.
U.S. DEPARTMENT OF LABOR: Ralph G. Cantrell, Commissioner,
Virginia Employment Commission; Augustin Alcee, Easaw
Moore, Elton Ruffin, Donald Lee Boyd, Herbert L. Davis,
Vincent Clark, John Paul Jones, Appellees.
 No. 84-1181.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 30, 1984.
Decided March 13, 1985.
 
 Albert D. Misler, Washington, D.C. (Morris Kletzkin; Robin D. Kardon; Friedlander, Misler, Friedlander, Sloan & Herz, Washington, D.C., W. Carrington Thompson; Clement & Wheatley, Danville, Va., on brief), for appellant.
 Chester A. Hurwitz, U.S. Dept. of Labor, Washington, D.C. (Francis X. Lilly, Sol. of Labor; Charles D. Raymond, Deputy Associate Sol. for Employment and Training; Harry L. Sheinfeld, Counsel for Litigation, Washington, D.C., Robert J. Barry, Asst. Atty. Gen., Richmond, Va., Robert N. Moore, Bangor, Me., on brief), for appellees.
 Before WINTER, Chief Judge, and RUSSELL and CHAPMAN, Circuit Judges.
 HARRISON L. WINTER, Chief Judge:
 
 
 1
 Plaintiff Virginia Agricultural Growers Association (VAGA) is an association representing southern Virginia tobacco growers. VAGA seeks declaratory and injunctive relief against the Department of Labor (DOL) and the Virginia Employment Commission (VEC). VAGA claims that DOL's "50% rule" governing the hiring of seasonal foreign workers is an arbitrary and capricious regulation issued without legal authority. The rule requires employers petitioning the Immigration and Naturalization Service (INS) for seasonal foreign labor to give a written assurance that they will hire available domestic workers for the same jobs until 50% of the foreign workers' contract has elapsed. The district court upheld the challenged regulation. Virginia Agricultural Growers Association v. Donovan, 579 F.Supp. 768 (W.D.Va.1984). We affirm.
 
 
 2
 I. Statutory and Regulatory Framework.
 
 
 3
 The Immigration and Nationality Act (INA), 8 U.S.C. Sec. 1101 et seq., is the statute governing the admission of seasonal foreign workers into the United States. Section 1101(a)(15)(H)(ii) defines this class of nonimmigrants as workers "coming temporarily to the United States to perform temporary services or labor, if unemployed persons capable of performing such service or labor cannot be found in this country...." Admission of these 'H-2 program' foreign workers "shall be for such time and under such conditions as the Attorney General may by regulation prescribe...." 8 U.S.C. Sec. 1184(a). The question whether to import such labor in any specific case "shall be determined by the Attorney General, after consultation with appropriate agencies of the Government, upon petition of the importing employer." 8 U.S.C. Sec. 1184(c).
 
 
 4
 Pursuant to this statutory authority, INS, the Attorney General's agent for this program, has issued regulations on how employers must petition for seasonal labor. Employers seeking foreign seasonal laborers must first obtain from DOL either a certification "stating that qualified persons in the United States are not available and that the employment of the [foreign workers] will not adversely affect the wages and working conditions of workers in the United States similarly employed, or a notice that such a certification cannot be made...." If the employer cannot get a certification from DOL then it can present to INS "countervailing evidence that qualified persons in the United States are not available and that the employment policies of [DOL] have been observed." 8 C.F.R. Sec. 214.2(h)(3)(i).
 
 
 5
 Pursuant to this delegated INS authority, DOL has issued regulations on the issuance of H-2 program certifications. To get DOL certification, employers must make numerous assurances about the employment involved. One is an assurance to "provide employment to any qualified U.S. worker who applies to the employer until fifty percent of the period of the work contract, under which the foreign worker who is in the job was hired, has elapsed." 20 C.F.R. Sec. 655.203(e). DOL's only means of enforcing such regulations is the provision that an employer failing to live up to the terms of a certification may not be "eligible to apply for a temporary labor certification in the coming year." 20 C.F.R. Sec. 655.210(a). "No other penalty shall be imposed by the employment service" under DOL regulations on such an employer. 20 C.F.R. Sec. 655.210(b).
 
 
 6
 II. Factual Background.
 
 
 7
 The district court opinion sets out the relevant facts, which we summarize. VAGA obtained DOL certifications to support its INS petition for the admission of about 600 H-2 workers. The workers were needed to work during the tobacco harvest starting July 5, 1983, since not enough domestic workers were available. In obtaining these certifications, VAGA agreed to abide by DOL employment policies.
 
 
 8
 After VAGA had contracted for the H-2 labor, VEC asked VAGA to interview and hire about fifty-five U.S. workers under the 50% rule. VAGA announced it would not comply with the 50% rule, and filed this suit. DOL responded by notifying VAGA it would be ineligible for a labor certification the following year.
 
 
 9
 VAGA offered testimony showing that its member farmers had no open jobs when told to interview and hire the fifty-five U.S. workers. Hiring these workers would as a practical matter have required laying off some H-2 workers. Second, VAGA complained that DOL regulations required its members to pay the laid-off H-2 workers for three-quarters of the contract period anyway.[1] Finally, VAGA introduced evidence to show that the domestic workers hired often did not remain on the job. Hence if VAGA farmers fired H-2 workers to hire domestic workers who then quit, they would face the harvest short-handed and might lose part of their crop.
 
 
 10
 III. DOL's Authority to Issue the 50% Rule.
 
 
 11
 The 50% rule, to be valid, must be consistent with the statute under which it is promulgated. Cf. United States v. Larionoff, 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977). The grant of authority relied on in issuing the rule, however, need not be specific; it is only necessary "that the reviewing court reasonably be able to conclude that the grant of authority contemplates the regulations issued." Humana of Virginia v. Blue Cross of Virginia, 622 F.2d 76, 78 (4 Cir.1980) (quoting Chrysler Corp. v. Brown, 441 U.S. 281, 308, 99 S.Ct. 1705, 1720, 60 L.Ed.2d 208 (1979)). We conclude that the statutory and INS grant of authority to DOL contemplated the 50% rule issued here.
 
 
 12
 VAGA argues that the 50% rule is inconsistent with statutory and INS authority in two fundamental respects. First, VAGA claims that the 50% rule contradicts the INA's basic policy of providing a viable means to obtain supplementary labor. Second, VAGA claims that DOL goes beyond its authorized consultative role by imposing the 50% rule as a condition of obtaining the labor certification employers use to petition the INS for admission of foreign seasonal labor.
 
 
 13
 A. Consistency with INA Immigration Policy.
 
 
 14
 VAGA's argument that the 50% rule contradicts the INA's underlying policy is grounded on the statute's goal of admitting needed seasonal foreign labor. VAGA downplays, however, the statute's concurrent purpose of protecting American labor. Considering the 50% rule in light of both these objectives, we find it consistent with the INA's basic statutory intent.
 
 
 15
 The INA itself provides that the Attorney General will decide questions of importing H-2 foreign seasonal workers, after consultation with appropriate agencies, on petition of employers. The House Judiciary Committee report explained that the purpose of this provision, Sec. 101(a)(15)(H) of the Act, was to
 
 
 16
 grant the Attorney General sufficient authority to admit temporarily certain alien workers, industrial, agricultural, or otherwise, for the purpose of alleviating labor shortages as they exist or may develop in certain areas or certain branches of American productive enterprises, particularly in periods of intensified production.[2]
 
 
 17
 The provision thus delegates to the Attorney General the authority to decide when nonimmigrant workers need to be admitted to alleviate labor shortages.
 
 
 18
 Congress granted the authority to admit H-2 foreign seasonal workers in the context of an Act that "provides strong safeguards for American labor."[3] A safeguard noted in the House Report is Sec. 212(a)(14), 8 U.S.C. Sec. 1182(a)(14). This provision excludes immigrant labor (as distinguished from temporary nonimmigrant labor) unless DOL certifies that there are not sufficient domestic workers, and that the employment of such immigrants would not adversely affect the wages and working conditions of workers in the United States similarly employed.[4]
 
 
 19
 Another safeguard is the qualification of the Attorney General's authority to admit temporary foreign workers at issue in this case. The proposed Act originally provided simply that the question of importing H-2 workers "shall be determined by the Attorney General upon petition of the importing employer." S.716, 82d Cong., 1st Sess. Sec. 215(c) (1951). Domestic labor representatives, however, objected to this provision, arguing that only the Secretary of Labor had the expertise to determine the need for foreign workers:
 
 
 20
 [The proposed provision gives] the Attorney General complete discretion to allow aliens to enter this country without any limitation on time or number to do work in the country if there were not available unemployed persons in this country to fill the jobs.... [It is] undesirable to give such authority to a person not thoroughly acquainted with the labor needs of the economy.... In order to protect domestic labor from competition of nonresident aliens, the law should provide that the Secretary of Labor should be required to make a thorough survey of the labor market, certify the need for the importation of foreign labor, and establish regulations governing the importation and use of such labor.[5]
 
 
 21
 Congress then changed the H-2 provisions to require that the Attorney General decide H-2 petitions only "after consultation with appropriate agencies of the Government." 8 U.S.C. Sec. 1184(c).
 
 
 22
 The Attorney General's agent, INS, has exercised its delegated authority to decide H-2 employer petitions after consultation with appropriate agencies by looking to DOL for advice. Petitioning employers must provide INS with DOL certification (1) that "qualified persons in the United States are not available" and (2) that "the employment of the beneficiary will not adversely affect the wages and working conditions of workers in the United States similarly employed...." 8 C.F.R. Sec. 214.2(h)(3)(i). This regulatory standard for advising on the admission of temporary nonimmigrants in essence parallels the statutory standard that DOL uses for considering the admission of immigrants. In this way both the statute and INS regulations provide similar safeguards for American workers.
 
 
 23
 VAGA concedes that the INA provides for some protection of domestic workers, but complains that the INS asks DOL about the availability of domestic workers only at the time of certification. This is incorrect. The INS regulation also asks DOL to certify that the H-2 workers employed "will not" adversely affect the wages and working conditions of domestic workers. 8 C.F.R. Sec. 214.2(h)(3)(i) (emphasis added). Thus the INS certification regulation contemplates that DOL will obtain employers' assurances regarding future employment of domestic workers. Indeed, without employers' assurances regarding their future conduct, it would be impossible for DOL to predict for INS a given petition's future effect on domestic employment. DOL regulations require several such assurances, such as complying with applicable laws, cooperating in the active recruitment of domestic workers until the H-2 workers depart for the employer's place of employment, and guaranteeing workers certain wages and terms of employment. See 20 C.F.R. Secs. 655.202, 655.203. DOL can properly ask for assurances that employers will hire domestic workers at least during part of the contract period, since any domestic unemployment resulting from the use of H-2 workers could reasonably be predicted to have an adverse effect on wages and conditions for domestic workers generally.
 
 
 24
 VAGA also complains that the 50% rule entirely undermines the statutory policy of providing adequate labor. The effect of the rule, VAGA argues, is that producers would have to fire H-2 workers to hire any available domestic replacements. Domestic workers, they argue, are "realistically" an unreliable source of labor because they often quit, and the employer is then left without an adequate labor supply, contrary to statutory intent.
 
 
 25
 We reject this argument. First, the 50% rule requires only that employers accept qualified U.S. workers who apply for jobs during the first half of the H-2 contract period. 20 C.F.R. Sec. 655.203(e). Second, the INS regulations require employers to interview and hire qualified U.S. workers before they petition for the admission of foreign workers, even if there is a business justification for preferring the foreign workers as a class. As the First Circuit has noted:
 
 
 26
 We recognize that appellee's business depends on the proper harvesting of its crop during the brief span of weeks when the apples are ready, and that there may be good reason for appellee's wish to be able to rely on the experienced crews of British West Indians who have performed well in the past, but here that preference collides with the mandate of a Congressional policy. To recognize a legal right to use alien workers upon a showing of business justification would be to negate the policy which permeates the immigration statutes, that domestic workers rather than aliens be employed wherever possible.
 
 
 27
 Elton Orchards v. Brennan, 508 F.2d 493, 500 (1 Cir.1974). Since employers must hire qualified domestic workers at the beginning of the harvest despite any preference for foreign labor, we cannot say it is inconsistent to require the same preferment for American workers once the harvest has begun.
 
 
 28
 B. Whether DOL Exceeds Its Consultative Role.
 
 
 29
 The INA provides for consultation with appropriate agencies before the granting of H-2 petitions. INS has by regulation provided for consultation with DOL to determine whether labor market shortages justify importing seasonal workers. VAGA claims that DOL goes beyond this delegation to usurp INS's power in mandating a continuing preference for domestic workers. Even if the 50% rule is consistent with the INA, in other words, VAGA argues that it is for INS and not DOL to enact such a provision.
 
 
 30
 We find no merit in this argument. Proof that DOL remains within its consultative role is the simple fact that both INS and DOL regulations reserve for INS the ultimate decision on any petition to admit H-2 foreign seasonal workers. INS regulations provide that, on DOL notice that a certification cannot be made, the employer may present INS with "countervailing evidence that qualified persons in the United States are not available and that the employment policies of the Department of Labor have been observed." 8 C.F.R. Sec. 214.2(h)(3)(i). DOL regulations provide that "the employer has a right to contest any denial" of a certification "before the INS pursuant to 8 C.F.R. 214.2(h)(3)(i)." 20 C.F.R. Sec. 655.201(c). Further, the possible denial of such a commendation to INS is DOL's only means of inducing petitioning employers to abide by their certification assurances. 20 C.F.R. Sec. 655.210(b).
 
 
 31
 INS has countenanced the present 50% rule or a similar one since 1964. Indeed, Sec. 602.10(i)(3)(iv) of DOL's 1964 H-2 regulations imposed an even more extensive obligation on employers, requiring an assurance that whenever "domestic workers become available for jobs in which foreign workers are employed, the domestic workers must be given preference." 29 Fed.Reg. 19,10 1 (1964). INS has for over twenty years made no effort to have DOL change its H-2 regulations, but has relied instead on DOL's labor market expertise and advice. These observations confirm our conclusion that DOL has not usurped any INS authority, but has performed the consultative role that the statute intended.
 
 
 32
 IV. DOL Compliance with APA Procedural Requirements.
 
 
 33
 VAGA argues that issuance of the 50% rule was arbitrary, capricious, and not in accordance with law because of DOL's failure to comply with the Administrative Procedure Act. VAGA recognizes the challenged rulemaking as informal notice-and-comment rulemaking governed by 5 U.S.C. Sec. 553. It nevertheless insists that DOL fails to meet even the relatively limited requirements for such rulemaking. We are not persuaded by this argument.
 
 
 34
 Section 553(c) requires (1) that the agency give notice of the proposed rules and consider "the relevant matter presented," and (2) that it "incorporate in the rules adopted a concise general statement of their basis and purpose." Here the agency considered the relevant matter presented by about 170 organizations and individuals during hearings held in six different locations. It also considered about 250 letters received before the hearings. Further, as the district court notes, the agency heard testimony on "the precise problems VAGA complains of in this lawsuit--having to pay the H-2 workers 3/4 of the work contract whether or not they were needed and terminating them because of the need to hire the domestic crew...." 579 F.Supp. at 776.
 
 
 35
 Second, DOL has set forth a general statement of the basis and purpose for the rules governing employer certification. DOL states that the regulations "shall be construed to effectuate the purpose of the INA that U.S. workers rather than aliens be employed wherever possible.... Where temporary alien workers are admitted, the terms and conditions of their employment must not result in a lowering of the terms and conditions of domestic workers similarly employed." 43 Fed.Reg. 10,312 (1978), 20 C.F.R. Sec. 655.0(e).
 
 
 36
 DOL has also specifically discussed its basis for the challenged regulation. "Employers urged," DOL noted in issuing the 50% rule, "that their responsibility in this regard should end at the time of certification." Worker representatives, on the other hand, "urged that the responsibility should continue until the end of the harvest," as the earlier regulation had provided. DOL stated that it chose the 50% rule as a "reasonable middle course" between these competing interests. 43 Fed.Reg. 10,308 (1978).
 
 
 37
 V. DOL's Rational Basis for Enacting the 50% Rule.
 
 
 38
 VAGA argues that the 50% rule lacks a rational basis and is therefore arbitrary and capricious. In reviewing this challenge to the rule, we may not substitute our judgment for the agency's. We are limited to determining whether "there has been a clear error of judgment." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The 50% rule survives this test.
 
 
 39
 VAGA claims that the 50% rule is arbitrary and capricious because its application threatens an established industry. The trial evidence, it claims, established "beyond question" that employer compliance with the rule "could be destructive of tobacco farming in southside Virginia." VAGA argues that a rule threatening such economic carnage is arbitrary and capricious, citing H & H Tire Co. v. United States Department of Transportation, 471 F.2d 350 (7 Cir.1972).
 
 
 40
 The district court, however, found only that the rule "might very well cause a hardship to [VAGA's] members." 579 F.Supp. at 776. The fact that a regulation may cause economic hardship does not make such a regulation unreasonable. H & H Tire at 354. Further, DOL has applied the 50% rule or its predecessor to agricultural producers for decades. This is not a case where a new regulation not yet in effect threatens to bankrupt an industry, as in H & H Tire, but a rule that agricultural businesses have coped with over the past twenty years.
 
 
 41
 VAGA also claims generally that DOL has failed to demonstrate a rational connection between the facts found and the choice made in issuing the 50% rule. We disagree. The rule rationally balances the need for an adequate seasonal labor force with the goal of protecting the wages and conditions of domestic workers similarly employed. Given the need to draw some line between competing policies, some "reasonable middle course," we cannot conclude that the DOL's 50% rule was a clear error of judgment.
 
 
 42
 AFFIRMED.
 
 
 
 [1]
 The district court and the parties below assumed that the three-quarters guarantee applied to foreign as well as U.S. workers. At oral argument before this court, DOL for the first time raised the issue of whether the three-quarters guarantee applies only to domestic workers. The three-quarters guarantee is contained in 20 C.F.R. Secs. 655.202(b)(6)(i) and 655.203(d)(2)(i). DOL argues that Sec. 655.202(b)(6)(i) only prescribes the terms of a job offer for U.S. workers and Sec. 655.203(d)(2)(i) only prescribes the form of newspaper advertisement for the recruitment of U.S. workers. A literal reading of the two sections supports the argument, but VAGA in a postargument brief has tendered evidence of a contrary administrative interpretation applied to a Maine employer of alien loggers and shovel-loader operators. We do not decide the proper interpretation of the regulations. Rather, we assume without deciding that the three-quarters guarantee applies to both foreign and U.S. workers, since resolution of this issue does not alter our ultimate disposition of the case
 
 
 [2]
 H.R.Rep. No. 1365, 82d Cong., 2d Sess., reprinted in 1952 U.S.Code Cong. & Ad.News 1653, 1698
 
 
 [3]
 Id. at 1705
 
 
 [4]
 Id
 
 
 [5]
 Revision of Immigration, Naturalization, and Nationality Laws: Joint Hearings on S. 716, H.R. 2379, and H.R. 2816 Before the Subcomms. of the Comms. on the Judiciary, 82d Cong., 1st Sess. 664-65 (statement of Walter Mason, member, National Legislative Committee, American Federation of Labor)