**VIRGINIA AGRICULTURAL GROWERS ASSOCIATION, INC., et al., Plaintiffs,**

v.

**Raymond J. DONOVAN, Secretary of Labor, et al., Defendants,**

**and**

**Sherman and Debra Paulk, Defendants-Intervenors.**

**FREDERICK COUNTY FRUIT GROWERS ASSOCIATION, INC., et al., Plaintiffs,**

v.

**Raymond J. DONOVAN, Secretary of Labor, et al.,**

**and**

**Cedrick Turner, Vincent Clark, and Gene R. Reeder, et al., Defendants-Intervenors.**

**Civ. A. Nos. 83–0146–D, 83–0147–D.**

United States District Court, W.D. Virginia, Danville Division.

Aug. 22, 1984.

Albert D. Misler, Morris Kletzkin, S. Steven Karalekas, Washington, D.C., W. Carrington Thompson, Clement & Wheatley, Danville, Va., William A. Johnston, Harrison & Johnston, Winchester, Va., for plaintiffs.

Dale M. Wiley, Va. Legal Aid Soc., Inc., Danville, Va., Edward J. Tuddenham, Inc., Migrant Legal Action Prog., Washington, D.C., Robert N. Moore, Farmworker Unit, Pine Tree Legal Assistance, Bangor, Maine, Robert Willis, NC Farm Worker's Legal Services, Raleigh, N.C., of counsel, for defendants-intervenors.

Thomas R. King, Jr., Asst. U.S. Atty., Roanoke, Va., Arthur Goldberg, Robert Damus, Dept. of Justice, Federal Programs Branch, Civil Div., Washington, D.C., for defendants.

## MEMORANDUM OPINION

KISER, District Judge.

Plaintiff, Virginia Agricultural Growers Association, Inc. ("VAGA"), is an incorporated association of agricultural producers consisting primarily of tobacco growers located in Virginia. VAGA's sole place of business is in South Boston, Virginia. Plaintiff Frederick County Fruit Growers Association, Inc. ("FCFGA"), is a Virginia corporation with headquarters in Winchester, Virginia. FCFGA has 67 members who are small apple growers operating in Frederick County and surrounding counties in the Commonwealth of Virginia. The remaining Plaintiffs are cooperative associations whose members are apple growers located in the states of Maryland and New York. All Plaintiffs in these two consolidated actions employ significant numbers

of domestic and temporary foreign farmworkers.

Defendant, Raymond J. Donovan, is the Secretary of the United States Department of Labor. Defendant United States Department of Labor ("DOL") is an executive department of the United States. Defendant-Intervenors are Cedrick Turner, Vincent Clark, Gene R. Reeder and Sherman and Debra Paulk, all of whom are domestic, migrant seasonal farmworkers.

These actions arise under the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(15)(H)(ii) and 8 U.S.C. § 1184(c) and the regulations promulgated thereunder, including 8 C.F.R. § 214.2(h)(3) (1983) and 20 C.F.R. §§ 655.0 through 655.212 (1983). DOL is responsible for the issuance of labor certifications pursuant to these statutes and regulations in the operation of the temporary foreign labor program (hereinafter referred to as the "H–2 program").[1] These cases also arise under the review provisions of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1982).

### I.

Plaintiffs brought this action in September, 1983, seeking invalidation of 20 C.F.R. § 655.207(b) as amended by Defendants on August 31, 1983, at 48 Fed.Reg. 40,168 (Sept. 2, 1983). Plaintiffs have asserted that subpart (b) is arbitrary and capricious in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706.

As amended on August 31, 1983, subpart (b) of Section 655.207, captioned "Adverse effect rates," provides:

(b)(1) For agricultural employment (except sheepherding) in the States listed in paragraph (b)(2) of this section, and for Florida sugar cane work, the adverse effect rate for each year shall be computed by adjusting the prior year's adverse effect rate by the percentage change (from the second year previous to the year previous) in the ES–202 report's aggregate average weekly wage rates for the appropriate group of agricultural workers. The appropriate group of workers shall be those U.S. agricultural workers employed by establishments in Standard Industrial Classification (SIC) Code Nos. 013, 016, 017, 019, 071 and 072 within that State (except that for purposes of age movement, but not actual adverse effect rates, New York, Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont shall be considered as one State, and Maryland, Virginia, and West Virginia shall be considered as one State). The Administrator shall publish, in each calendar year, on a date he shall determine, adverse effect rates calculated pursuant to the paragraph (b) as a notice in the *Federal Register*.

(2) *List of States.* Arizona, Colorado, Connecticut, Florida (other than sugar cane work), Maine, Maryland, Massachusetts, New Hampshire, New York, Rhode Island, Texas, Vermont, Virginia, and West Virginia. Other States may be added as appropriate.

(3) *Transition.* Notwithstanding paragraph (b)(1) and (2) of this section, the 1983 adverse effect rate shall be computed by adjusting the 1981 adverse effect rate by the percentage change in appropriate ES–202 average weekly wages from 1980 to 1982. The adverse effect rate for a State, set by this paragraph (b), shall be the highest of the rate computed by this methodology in paragraph (b) or the rate applied in the State in 1981 or 1982. Pursuant to the Order in *NAACP, Jefferson County Branch v. Donovan,* Civil Action No. 82–2315 [566 F.Supp. 1202] (D.D.C. June 28, 1983), the 1982 adverse effect rate for West Virginia was $4.24.

48 Fed.Reg. 40,168, 40,175 (Sept. 2, 1983).[2]

The administrative action that is being challenged by Plaintiffs began when DOL

---

1. *See Virginia Agr. Growers Ass'n, Inc. v. Donovan,* 579 F.Supp. 768 (W.D.Va.1984).

2. The 1983 adverse effect rates set by Defendants for the enumerated states are:

published a Notice of Proposed Rulemaking in the Federal Register on July 22, 1983, 48 Fed.Reg. 33,684, pursuant to an order of the United States District Court for the District of Columbia in *NAACP, Jefferson County Branch v. Donovan*, 566 F.Supp. 1202 (D.D.C.1983), that required the DOL to establish a methodology for setting hourly agricultural adverse effect wage rates (AEWR) for the 1983 harvest season, and to publish those rates no later than July 29, 1983. *See* 48 Fed.Reg. 33,684.

The AEWR is a minimum hourly wage guarantee intended to neutralize any "adverse effect" on domestic workers occasioned by the employment of temporary foreign workers. DOL's authority to establish the AEWR is limited to establishing a wage rate necessary to preclude an "adverse effect" on the wages of similarly employed domestic workers. *See* 20 C.F.R. § 655.207. DOL has for decades set wage rates which growers must agree to pay domestic field workers before DOL will certify that the admission of aliens to work in the growers' field will not adversely affect the wages and working conditions of U.S. workers similarly employed. *See* 48 Fed.Reg. 33,684 (July 22, 1983) and 48 Fed. Reg. 40,168. Between 1968 and 1981 for most states and crops (and between 1975 and 1981 for Florida sugar cane), DOL computed adverse effect rates by adjusting the previous year's rates by the same percentage change as the annual percentage change (from the second preceding year to the preceding year) in average work rates

| State | AEWR |
|---|---|
| Arizona | $4.22 |
| Colorado | (¹) |
| Connecticut | 4.05 |
| Florida (sugar cane only) | 5.37 |
| Florida (except sugar cane) | 4.34 |
| Maine | 4.15 |
| Maryland | 4.38 |
| Massachusetts | 4.05 |
| New Hampshire | 4.34 |
| New York | 4.20 |
| Rhode Island | 4.05 |
| Texas | 4.16 |
| Vermont | 4.28 |
| Virginia | 4.39 |
| West Virginia | 4.24 |

¹ Not yet available.

for field and livestock workers as reflected by survey data of the United States Department of Agriculture (USDA). *Id.*

In April 1981, the USDA ceased conducting quarterly surveys of wages paid to field and livestock workers, and instead began conducting one annual survey of wages paid to such workers during one week in July. The first such annual survey was conducted in July, 1982. Farmworkers in four states sued DOL objecting to DOL's failure either to devise a new AEWR methodology or to set individual AEWRs for 1982. That litigation resulted in a court order requiring DOL to establish a new AEWR methodology and to set AEWRs for 1982 for the four states involved in that litigation (Maine, Vermont, Florida, and West Virginia). *Bragg v. Donovan*, No. 82–2361 (D.D.C. August 23, 1982). In response, DOL calculated a 1982 AEWR limited to the states involved in the suit and extended the 1981 AEWR into 1982 for all other states.[3]

DOL's continued failure to devise a new methodology for indexing AEWRs generally resulted in a second court order in another proceeding. *NAACP, Jefferson County Branch v. Donovan*, 566 F.Supp. 1202 (D.D.C.1983). Because more than two years had passed since USDA announced the curtailment of its quarterly survey, and because during that period DOL had failed to act, a second court order was issued giving DOL until July 29, 1983, to propose a methodology for setting AEWRs for the 1983 harvest season for all states in which H–2 workers would be employed.[4]

*Id.* at 40170.

**3.** DOL calculated the 1982 AEWRs by extrapolating from the January and April, 1981 USDA quarterly survey statistics. 48 Fed.Reg. 235 (January 4, 1983).

**4.** In its opinion, the District Court commented on DOL's inaction:

On April 7, 1983 defendants submitted a memorandum to apprise the Court of DOL's intentions in setting AERs. The memorandum

On July 22, 1983, in response to the court order in the *NAACP* case, DOL published a notice of proposed rulemaking which set forth for the first time the ES–202-based AEWR methodology. 48 Fed.Reg. 33,684 (July 22, 1983). This rule proposed to index the AEWR by the percentage change in the annual average weekly earnings statistic derived from the ES–202 program. Thus, to determine the 1984 AEWR for a particular state, DOL would apply the percentage change in the average weekly earnings statistic between 1982 and 1983 to the existing 1983 AEWR for that state. 48 Fed.Reg. 40,170 (September 2, 1983). Each year's average weekly earnings statistic is estimated from the data collected by the ES–202 program.

The ES–202 data are reported to state employment security agencies by those agricultural employers who are covered by unemployment insurance. All covered employers are required by law to file these reports. Since 1978, all agricultural firms employing at least 10 workers in 20 weeks or having a $20,000 quarterly payroll, are covered by unemployment insurance. Each state agency receives quarterly reports from each covered employer reflecting both the total wages paid every three months and the number of domestic workers employed on the 12th of each month by that employer. The state agencies, in turn, report this data to Bureau of Labor Statistics (BLS). 48 Fed.Reg. 33,685. The data collected by the ES–202 program are grouped according to Standard Industrial Classification ("SIC") Codes. For purposes of indexing the AEWR, data from the following six (6) three-digit SIC codes are used: 013 (field crops), 016 (vegetables and melons), 017 (fruit and tree nuts), 019 (general farms), 071 (soil preparation services), and 072 (crop services). 48 Fed.Reg. 40,-169 (September 2, 1983).

DOL received a total of 206 comments on its proposed rule. Comments were received from congressional sources, farmworker representatives, employers, employer representatives, and federal, state, and county agencies. *See* Administrative Record, submitted with DOL's first Motion for Summary Judgment (December 8, 1983) ("Administrative Record"). The overwhelming majority of the comments criticized the proposed methodology. *Id.* The United States Sugar Corporation, among others, submitted with its comments a report prepared by Dr. James S. Holt, dated August 18, 1983. (Holt Report I)[5]. Dr. Holt's report analyzed the proposed ES–202 methodology and concluded that such methodology was totally inappropriate to index AEWRs as (i) the year-to-year movements in annual *earnings* produced by the ES–202 program is an inappropriate measure of year-to-year movements in hourly *wage rates* needed to set the AEWR; (ii) the ES–202 data base itself is inappropriate in that it is not representative of agricultural employment generally, does not measure "similarly employed" workers, and the data is not subject to adequate quality control; and (iii) the methodology has computational and methodological flaws including the untimeliness of the data and the possibility of completely artificial statistical results.

stated that DOL was considering a 3-step process for establishing AERs that would be ready for application by 1985. Additionally, defendants stated that action was being taken to promulgate 1983 AERs for all affected states. However, on June 6, 1983, shortly before issuing this opinion, the Court requested an update on what progress, if any, DOL had made toward accomplishing its stated intentions. Defendants' response disclosed that nothing of substance had been done during this time. Moreover, DOL stated that action on 1983 AERs was being deferred pending issuance of this opinion. This lack of progress by DOL in carrying out its statutory mandate further underscores the importance of the Court's declaring DOL's obligation to establish annual AERs now. It makes clear that if the Court found that this controversy was not yet ripe, it would be but a short while before plaintiffs had to return to the Court seeking this same relief.
*NAACP, Jefferson County Branch v. Donovan,* 566 F.Supp. 1202, 1207 n. 6 (D.D.C.1983).

5. Dr. Holt and his associate, L. Burton, also submitted a second analysis of this rule with Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Holt II).

Representatives of some farm workers submitted comments advocating use of the ES–202 data. Growers submitted · comments to DOL stating that the July USDA data, not the ES–202 data, should be used to calculate the percentage increases in the AEWRs from 1981 to 1983. The USDA commented that USDA rather than ES–202 data should be used, or that some totally new survey should be conducted to gather data.

On September 2, 1983, DOL published a final rulemaking which adopted the ES–202-based AEWR indexing methodology as originally proposed, with only minor modification. 40 Fed.Reg. 40,168 (September 2, 1983).

## II.

The Plaintiffs substantively attack the AEWR regulation as having no rational basis, and that, therefore, DOL's action was "arbitrary and capricious" in violation of the Administrative Procedure Act (APA).

■ The applicable standard of review, § 706(2)(A) of the APA, provides:

... that the reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary and capricious, an abuse of discretion or otherwise not in accordance with law ...

*Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). This standard is a highly deferential one. It presumes agency action to be valid. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). This is not to say, however, that the Court must rubber-stamp the agency decision as correct. To do so would render the review process superfluous. *Ethyl Corp. v. Environmental Protection Agency,* 541 F.2d 1, 34 (D.C.Cir.1976). Therefore, the Court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *Citizens to Preserve Overton Park, supra.* Although the Court is not permitted to substi-

tute its judgment for that of the agency, it must make a substantial inquiry into the facts to insure that the agency demonstrates a rational connection between the facts found and the choice made. *Id., see also United States Lines, Inc. v. Federal Maritime Commission,* 584 F.2d 519 (D.C. Cir.1978). Furthermore, the validity of the agency's action must be sustainable on the administrative record made. *Camp v. Pitts, supra,* 411 U.S. at 143, 93 S.Ct. at 1244; *Almay, Inc. v. Califano,* 569 F.2d 674, 681 (D.C.Cir.1977). ·

■ Although this Court is not to undertake *de novo* review of this agency action, neither is it realistic or wise to " 'straightjacket' the reviewing court with the administrative record" in all situations. *Asarco, Inc. v. United States E.P.A.,* 616 F.2d 1153 (9th Cir.1980). As the court in *Asarco, Inc., supra,* held:

If the reviewing court finds it necessary to go outside the administrative record, it should consider evidence relevant to the substantive merits of the agency action only for background information ... or for the limited purposes of ascertaining whether the agency considered all the relevant factors or fully explicated its course of conduct or grounds of decision.

.   .   .   .   .

It will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not. *Id.* at 1160.

DOL maintained that there should not have been a trial in this matter. However, I believe that the trial was necessary in order to determine whether DOL considered all relevant factors and in order to discharge properly my duty to engage in "substantial inquiry" as to whether the process employed by DOL to reach its decision took into consideration all the relevant factors. With this limited scope of review in mind, I have searched the rulemaking

record and considered other background information and can find no rational basis for the regulation for three primary reasons.

### A.

DOL has stipulated that the public record which was filed with its Motion for Summary Judgment on December 8, 1983, constitutes the entire administrative record relied on by DOL as the basis for promulgation of the September 2, 1983, AEWR rule. The administrative record contains (i) the proposed and final rules for 1982, 47 Fed.Reg. 52,198–99 (November 19, 1982) and 48 Fed.Reg. 234–35 (January 4, 1983), and 29 comments received by DOL, and (ii) the proposed and final rules for 1983, 48 Fed.Reg. 33,684–87 (July 22, 1983) and 48 Fed.Reg. 40,168–75 (September 2, 1983) and 206 comments received by DOL and DOL's responses thereto. The record as it stands contains no studies, no analysis, no memoranda and no empiracal evaluation of the ES–202 methodology, or any other methodology studied by DOL. In short, from the record, I cannot determine why DOL chose this method.

It is clear from the record itself that DOL was notified in 1981 that the USDA was no longer going to publish quarterly rates and thus a new methodology would need to be established. Painfully clear, too, is the fact that DOL simply sat on its hands until Judge Richey ordered DOL to publish new AEWRs no later than July 29, 1983. Any "time constraints" placed on DOL in adopting a new method were self-imposed by DOL's own failure to act quickly when notified of USDA's plan to move from quarterly to yearly surveys. "[A]n order .... to consider a matter expeditiously is not a mandate to be arbitrary, capricious, irrational or sloppy ..." *Puerto Rico Maritime Authority v. Federal Maritime Commission,* 678 F.2d 327, 336 (D.C. Cir.), *cert. denied,* 459 U.S. 906, 103 S.Ct. 210, 74 L.Ed.2d 167 (1982) (referring to time constraint placed on agency by order of Congress).

Dr. Leo Polopolus, an agricultural economist and witness for the Plaintiffs, indicated that in early 1981 when DOL first knew a change would have to be made, DOL had many alternatives which could have been developed or which existed. These include (i) the prevailing wage rate survey data; (ii) use of a stratified random sample of employers in affected states and affected commodities; and (iii) use of the annual USDA data. It is not my duty to select one of these methodologies over the ES–202 data. However, when the record is essentially bare as to the agency's inquiry, its analysis, and its reasoning in selecting the ES–202 data, I must conclude that such a decision does not constitute reasoned decision-making.

DOL argues that it has "broad discretion" to set AEWRs in accordance with "any number of reasonable formulas ...." *Florida Sugar Cane League, Inc. v. Usery,* 531 F.2d 299, 303–04 (5th Cir.1976); *Rowland v. Marshall,* 650 F.2d 28 (4th Cir.1981). In *Rowland v. Marshall, supra,* the Fourth Circuit, however, pointed out that:

There is ample evidence in the record to support [the] conclusion [that the methodology used to calculate the AEWR is not arbitrary and capricious], including evidence that the Department of Labor reviewed the AEWR methodology in 1977 by testing it against other possible methodologies. Using the various methodologies studied in 1977 with the 1980 data, the Department of Labor found that the AEWR methodology currently used produced results comparable to those produced by the other potential methodologies. *Rowland v. Marshall, supra* at 30 n. 3.

Although DOL does have discretion to choose among reasonable formulas, there simply is no evidence in the administrative record before me that DOL tested this methodology against others and studied its consequences and effects. The ES–202 methodology was simply published, and there is just not one iota of information in the record which clearly and adequately discloses the grounds upon which DOL act-

ed in selecting this methodology. The paucity of any reasoning in support of the ES–202 methodology over some other alternative indicates to me that DOL had chosen this method prior to receiving public comment to satisfy the Court's Order in the *NAACP* case and that the public comment process was simply a formalistic exercise.

### B.

Secondly, a most troublesome aspect of the ES–202 methodology is that it is an invalid measure of the AEWR. In Holt Reports I and II and in his testimony at trial, Dr. Holt identified and explained in detail seven crucial defects in the ES–202 methodology. After his own analysis of the ES–202 methodology and of Dr. Holt's work criticizing that methodology, Dr. Polopolus, a second agricultural economist, agreed with each of the seven defects in the ES–202 methodology identified by Dr. Holt and with Dr. Holt's overall conclusion that the ES–202 program data provides an invalid mechanism for indexing changes in AEWRs. Dr. Jerome M. Staller, an economist and witness for Defendant-Intervenors', also generally concurred with Dr. Holt's criticisms of the ES–202-based AEWR methodology.[6]

Dr. Holt's first criticism of DOL's ES–202 methodology is fundamental to the methodology itself: The average weekly earnings statistic derived from the data collected by the ES–202 program is a totally inappropriate proxy for calculating changes in the AEWR, which by definition is an hourly wage rate standard. DOL admits that the ES–202 program produces no hourly wage data.

The regulation would annually adjust the AEWR by the percentage change in an estimate of average weekly earnings. Average weekly earnings are estimated in the rule by dividing total annual payroll by an estimate of annual work weeks of employment aggregated over the relevant SIC classifications. Thus the DOL rule indexes an hourly wage rate by year-to-year move-

ments in an estimate of average weekly earnings.

Dr. Holt indicated that a change in hourly wage rates is only *one* of the factors influencing year-to-year changes in annual earnings and the average weekly earnings figure estimated from that figure. Year-to-year changes in average weekly earnings can and do commonly occur in agriculture for reasons wholly unrelated to changes in hourly compensation rates. These reasons include variations in crop size, in the length of the work week, and the length of the season, variations in productivity, changes in labor supply and/or labor management practices, and changes in the composition of the agricultural work force.

Because year-to-year changes in per employee annual earnings of seasonal agricultural workers are likely to be influenced far more by changes in the amount of employment than by changes in hourly wage rates, and the year-to-year movements in average weekly earnings produced by the ES–202 data for the six three-digit SIC codes used to index the AEWRs are highly erratic. *See* Plaintiffs' Trial Exhibit 7; Holt Report I, at p. 7; Holt Report II, at p. 26.

In its commentary accompanying the final rulemaking, DOL attempted to counter the criticism that factors causing changes in average weekly earnings are unrelated to changes in compensation rates and result in independent movements in average weekly earnings and average hourly wages over the same time period. DOL asserted that "it is anticipated that these factors would cancel each other out ... and that over time productivity and earnings would change at a steady rate." 48 Fed.Reg. 40,170 (September 2, 1983). According to Dr. Holt, this assertion is neither true nor relevant for three reasons: (i) the AEWR is not a measure of productivity or earnings; (ii) the ES–202 data used in indexing the AEWR show no evidence of "cancelling out" overtime; and (iii) since the AEWR is

---

6. Dr. Staller's main area of disagreement with Dr. Holt was that he (Staller) felt the weekly

wage movement was a substantially accurate measure of hourly earnings movement.

changed from one year to the next year (and a grower employing H–2 labor must pay each year's AEWR for that year), the overall cumulative change in the yearly statistic used to measure the AEWR is meaningless.

A further criticism presented by Dr. Holt was that the six three-digit SIC codes used to index the AEWR contain significant amounts of non-agricultural employment. *See* Holt Report I, at pp. 15–19; Holt Report II, at pp. 32–35; Tr. at 70–81 (Holt).[7] Examples of such employment include non-production employees, such as bookkeepers and supervisors. According to Dr. Holt the inclusion of such employment undermines the usefulness of the ES–202 data in measuring characteristics of "similar employment". In addition, wage movements of non-agricultural workers are likely influenced by different factors than those of agricultural workers.

In the commentary accompanying its final rulemaking, DOL stated that inclusion of non-similarly employed workers in the ES–202 data base did not "significantly affect" the outcome of the new AEWR methodology because "DOL has not been persuaded" that wages of agricultural workers move differently from the wages of non-agricultural workers. 48 Fed.Reg. 40,171 (September 2, 1983). It is clear from the record, however, that prior to issuing the final rule, DOL performed no analysis of the effect of the inclusion of non-agricultural workers in the ES–202 data base on the validity of the methodology.

Another criticism leveled by Dr. Holt was in the notice of proposed rulemaking DOL cited uses of the ES–202 data by other agencies as a justification for the proposed methodology. 48 Fed.Reg. 33,684 (July 22, 1983).[8]

Public comments on the proposed rule disclosed that the other agency uses of ES–202 data cited by DOL were not related to the manner in which DOL proposed to use the ES–202 data. Those comments also noted that major users of ES–202 data specifically excluded the agricultural ES–202 data.

In publishing the final rule, DOL responded to the criticism that the other uses of the ES–202 data cited by DOL as justification for use of that data to index the AEWR were in fact irrelevant to the proposed methodology by stating that "[w]hile the agricultural portion of the ES–202 data series has not yet attained as wide currency as other portions of the data series, this is in part due to the relatively recent unemployment compensation coverage of agricultural workers." 48 Fed.Reg. 40,170 (September 2, 1983). In the final rule, DOL repeated these same uses of the data series in support of its use of the ES–202 data asserting that the "data are recognized by competent statistical authorities as being valid ..." 48 Fed.Reg. 40,169 (September 2, 1983). However, the record does not reveal that DOL conducted any investigation as to the validity of the commentors' concerns.

A most serious flaw, I feel, is that the data is untimely. The final rule established the following method for determining the AEWR for 1984 and subsequent years:

> The final rule ... would use the one-year movement from the beginning of the second year previous to the end of the first year previous to set the movement from the prior year's AEWR to the current year's AEWR.

48 Fed.Reg. 40,170 (September 2, 1983). Thus, the 1984 AEWR for a particular state is determined by applying the percentage change in the annual average weekly earnings statistic between 1982 and 1983 to the existing 1983 AEWR for that state. DOL must have the average weekly

---

7. *See also* USDA Secretary John Block's Comments as to this defect. Administrative Record, Document 203.

8. *See also* Administrative Record, Document No. 189 (Comments on the National Council of

Agricultural Employers); Document No. 191 (Comments of Agricultural Producers, Valencia, California); Document No. 202 (Comments of Florida Sugar Institute); Document No. 203 (Comments of Secretary John R. Block, USDA).

earnings statistics produced by the ES–202 data for both 1982 and 1983 in order to determine the 1984 AEWR. Yet, the preliminary uncorrected tabulations of the ES–202 data for 1983 will not be available until September of 1984—the year for which the AEWR is to be used. The same situation will recur in all subsequent years in which the ES–202 methodology is used to make annual AEWR adjustments.

Recruitment for the planting, cultivation and harvesting of tobacco and cabbage begins in January of each year. These crops are worked between April and September. Apple harvesting recruitment typically begins in July and continues through early September. Apple harvesting begins in early to mid-September. So by September, recruitment for apple, tobacco and cabbage agricultural work is finished and the cabbage and tobacco seasons are virtually over.

The AEWR purports to ensure against any "adverse effect" to "similarly employed" domestic workers which would otherwise be produced by employment of temporary foreign workers. *See* 8 C.F.R. § 214.2(h)(3). An AEWR based on ES–202 data simply cannot prevent an adverse effect, and, therefore, achieve the result for which it is purportedly designed, since it is unavailable at the time when an adverse effect is likely to occur—during the recruitment and hiring of farm workers.

The record before the Court demonstrates that the ES–202 data needed to promulgate the AEWR for a given year is not available to DOL until September of the year for which the AEWR is to be promulgated. The ES–202 data is not available when needed and the ES–202 methodology, therefore, is not a reasonable method for determining the AEWR.

This methodology was also criticized by USDA Secretary, John Block, who stated that "the ES–202 program data are inappropriate for determining annual changes in the AEWRs." *See* Administrative Record Document 203 at p. 1. More specifically, Secretary Block explained that (i) the ES–202 data does not cover small agricul-

tural employers (except in six jurisdictions) and only 40 percent of the workers in United States agriculture are represented in the ES–202 data; (ii) although DOL lists several ways that ES–202 program data are use for other purposes as a means of justifying their use to compute annual changes in the AEWRs, for the most part the cited uses of this data use only non-agricultural ES–202 data; and (iii) the proposed rule would adjust the AEWRs on the basis of changes in the estimated average weekly wages (not hourly wages) of all types of workers employed on farms covered by unemployment insurance—an average weekly wage is an inappropriate indicator of hourly wage rates, which is what the AEWR is supposed to measure. *Id.* at p. 2–3.

The comments of Secretary Block further suggested that to ensure an objective and reliable computation of H–2 wage rates, "an appropriate new data series and a totally new methodology must be developed." As a stop gap measure only, Secretary Block recommended that DOL use the wage data from the USDA July farm labor surveys to compute the 1983 AEWRs. *Id.* at p. 4.

It is apparent that the criticisms of Drs. Holt, Polopolus and Secretary Block point out serious deficiencies in the statistical validity of using the ES–202 data series to calculate annual changes in the AEWRs. Although DOL responded to most of these comments in the publication of the final rule, in my opinion this does not bolster the validity of this methodology so as to ratify the actions of DOL in establishing a methodology that simply does not measure what it is supposed to measure. This methodology is inappropriate and a new methodology must be established. It is clear that DOL realizes this for in the final rulemaking the agency seems to justify the final rule by indicating that:

This rulemaking meets the critical need, created by the recent Orders in *NAACP, Jefferson County Branch v. Donovan,* and the impending 1983 harvest season, to set AEWRs for 1983 and does not foreclose a determination by DOL to in-

stitute in later years other changes in the AEWR regulations. 48 Fed.Reg. 40,173 (September 2, 1983)

Although it is clear that DOL has the authority to make changes in the AEWR, this self-serving declaration indicates, as did Mr. Richard Gilliland (Director, United States Employment Service, under whose direction the final rule was developed) at trial that the ES–202 methodology is simply a stop gap measure.[9] In my opinion, such a choice by DOL represents a clear error of judgment.

### C.

Finally, there are indications that the Secretary did not in fact sufficiently consider the comments which were submitted to the proposed rule. The proposed rule was published on July 22, 1983, and originally written comments were to have been received by August 5, 1983—a mere 10 business days later. As many commentators pointed out to DOL, there was no way a proper analysis of the true impact of the proposed regulations could be made in such a short time. The DOL did extend the comment period through August 22, 1983—another 2 weeks. This still is a very short time to sufficiently comment on such a technical regulation.

The final rule was published on September 2, 1983, just 11 days (8 business days) after the close of the comment period in which over two hundred comments were submitted. Common sense dictates that proper consideration could not have taken place in that brief span, and indeed the administrative record reflects that it did not. Cursory responses to comments which point out glaring deficiencies in this data series as a measure of the AEWR does not comply with DOL's responsibility to consider and respond to such comments. The fact is, DOL was under the gun of Judge Richey's court order, selected this methodology with no indication in the administrative record as to how it was select-

ed, and was going to publish this as a final rule regardless of what the commentators submitted. Such action in my opinion is arbitrary and capricious, and the regulation must be overturned.

In conclusion, for the foregoing reasons, I find the regulation at 20 C.F.R. § 655,-207(b) as amended by DOL on August 31, 1983, and found at 48 Fed.Reg. 40,168 (September 2, 1983) to be arbitrary and capricious and in violation of 5 U.S.C. § 706.

The Clerk is directed to send certified copies of this Memorandum Opinion to all counsel of record.

### ORDER

For the reasons stated in the Memorandum Opinion filed this day, it is hereby ADJUDGED and ORDERED that:

1. The regulation promulgated by the Department of Labor at 20 C.F.R. § 655.-207(b) as amended by DOL on August 31, 1983, and found at 48 Fed.Reg. 40,168 (September 2, 1983) is arbitrary and capricious and in violation of 5 U.S.C. § 706.

2. The Secretary of Labor shall promulgate an Adverse Effect Wage Rate for the year 1983 pursuant to the rule making provision of the Administrative Procedure Act and consistent with the Court's Opinion filed this date.

The Clerk is directed to send certified copies of this Order to all counsel of record.

---

**9.** At trial, Mr. Gilliland stated that DOL will request suggestions for methodologies for future years because it is the intent of DOL to return in 1982 to the USDA quarterly survey if such survey is reinstated. Trial Tr. at 371.